IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE VITAMIN OLDCO HOLDINGS, INC., (f/k/a GNC HOLDINGS, INC.), et al., | ) ) ) | Chapter 11 Bankr. Case No. 20-11662 (KBO) Adv. Proc. No. 24-50020 (KBO) |
| Liquidating Debtors. | ) | |
| JOHN YONG TANG and KARIS AL KOOHEJI, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 24-1376 (MN) |
| CITIC CAPITAL HOLDINGS LTD., et al., | ) ) | |
| Respondents. | ) ) | |

## MEMORANDUM OPINION

Christopher D. Loizides, LOIZIDES, P.A., Wilmington, DE; John Y. Tang, TANG PC, Hackensack, NJ – Attorneys for Petitioners.

Michael R. Nestor, Kara Hammond Cole, Michael S. Neiburg, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Michael J. Reiss, LATHAM & WATKINS LLP, Los Angeles, CA 90067 – Attorneys for Defendants Kenneth A. Martindale, Tricia K. Tolivar, Susan M. Canning, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer, and Robert F. Moran

Bradley R. Aronstam, Thomas A. Barr, Ross, ARONSTAM & MORITZ LLP, Wilmington, DE; John A. Neuwirth, Stefania D. Venezia, Nathan J. Montalto, WEIL, GOTSHAL & MANGES LLP, New York, NY – Attorneys for Defendants Evercore Inc. and Gregory Berube

Simon E. Fraser, COZEN O'CONNOR, Wilmington, DE; Nicole H. Sprinzen, Samantha Rubin Stratford, COZEN O'CONNOR, Washington, DC – Attorneys for Defendants CITIC Capital Partners LLC, GNC Holdings, LLC, ZT Biopharmaceutical LLC, Hans Allegaert, and Cameron Lawrence

September 29, 2025
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE**

Before the Court is the motion (D.I. 1) ("the Motion") of John Yong Tang and Faris Al Koooheji ("the Plaintiffs"), two former shareholders of GNC Holdings, Inc. ("GNC") and plaintiffs in the above-captioned adversary proceeding ("Adversary Proceeding")[1] currently pending in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). The Motion seeks an order withdrawing reference of the Adversary Proceeding pursuant to 28 U.S.C. § 157(d). Plaintiffs assert that withdrawal of the reference is mandatory because resolution of the Adversary Proceeding requires consideration of both bankruptcy law and non-bankruptcy federal law. Plaintiffs argue, in the alternative, that cause exists to withdraw the reference, as the Adversary Proceeding involves only non-core disputes between non-debtors, Plaintiffs demand a jury trial which only this Court can conduct, and because deferring withdrawal of the reference would result in delay, duplicative proceedings, and the inefficient use of limited judicial resources. Defendants[2] oppose the Motion. For the reasons set forth herein, the Motion is denied without prejudice to Plaintiffs' right to renew their request for withdrawal of the reference at such time as the proceeding is ready for trial or at such earlier time as the Bankruptcy Court may recommend.

I.    **BACKGROUND**

The Adversary Proceeding alleges a conspiracy to deprive certain shareholders of their equity in GNC for Defendants' financial gain. GNC is a formerly publicly-traded Delaware corporation,

---

[1] All references to "Adv. D.I." refer to *John Yong Tang et al. v. CITIC Capital Holdings, Ltd. et al.,* Adv. Proc. No. 24-50020 (KBO) (Bankr. D. Del.) ("the Adversary Proceeding"). All references to "Bankr. D.I." refer to *In re GNC Holdings, Inc. et al.*, Case No. 20-11662 (KBO) (Bankr. D. Del.).

[2] Defendants opposing the Motion are CITIC Capital Partners LLC ("CITIC"), GNC Holdings, LLC, ZT Biopharmaceutical LLC, Hans Allegaert, Cameron Lawrence, Kenneth A. Martindale, Tricia K. Tolivar, Susan M. Canning, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Michele S. Meyer, Robert F. Moran, Evercore Inc., and Gregory Berube.

which sold nutritional supplements. According to the operative complaint (Adv. D.I. 1-1) ("the Complaint"), the scheme involved the deliberate mismanagement of GNC to engineer a situation in which GNC was purportedly unable to pay its debts and thus forced to file for bankruptcy, all with the aim of enriching GNC executives and facilitating the acquisition of GNC's assets by its majority shareholder Harbin Pharmaceutical Group ("Harbin"), allegedly controlled by defendant CITIC. The Complaint alleges the coordinated acti vities of the various Defendants formed an unlawful enterprise, within the meaning the Racketeering Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, which "functioned for the purpose of allowing CITIC to acquire GNC in its entirety through unlawful activities and enrich CITIC, [its CEO] Zhang, along with GNC Management individual defendants, by working together to avoid refinancing measures which would have benefitted all shareholders, while maximizing their financial benefit." (Compl. ¶ 169).

### A.    The Parties

Plaintiffs were each minority shareholders of GNC Class A common stock. Defendants are entities and individuals involved in the alleged conspiracy. As relevant here, there are three categories of Defendants: CITIC; GNC directors and executives ("GNC Management"); and Evercore, Inc. ("Evercore"). The Complaint alleges CITIC is a state-owned Chinese investment company that controls Harbin. GNC Management consists of various company executives who perpetrated the alleged scheme. Evercore advised GNC on matters of debt restructuring and bankruptcy.

### B.    The Alleged Scheme

According to the Complaint, CITIC's efforts to acquire GNC date back to 2017 but were met with resistance from GNC Management. (Compl. ¶¶ 46-48). The Complaint alleges that, although CITIC had been able to purchase an approximately 40% stake in GNC, through Harbin, it was unsuccessful in its alleged goal of acquiring the company in its entirety. (*Id.* ¶ 48). The Complaint also alleges that "CITIC and [its CEO] Zhang devised and implemented an unlawful scheme, aim[ed]

at acquiring GNC at the expense of Plaintiffs and other minor shareholders" through a sequence of deceiving "strategic moves." (*Id.* ¶¶ 49-50).

Briefly stated, the "strategic moves" taken by Defendants prior to the bankruptcy filing included increasing CITIC's control over GNC's board, reducing GNC's liquidity, driving away potential investors, and narrowing GNC's options for restructuring its sizable debt. According to the Complaint, Defendants orchestrated a situation in which GNC would falsely claim it had no choice but to file for bankruptcy to manage its financial liabilities. (*Id*. ¶¶ 49-95). According to Plaintiffs, "GNC Management [had] been planning for bankruptcy for a long time, waiting for an opportunity to implement the bankruptcy plan to hand GNC to the secured lender in exchange for benefits for themselves," and in late 2018, GNC retained Evercore as its financial advisor, with efforts to be led by Defendant Berube, Senior Managing Director at Evercore. (*Id.* ¶ 95).

The Complaint alleges that GNC Management, CITIC, and Evercore together used the accelerated debt obligation of one of GNC's loans as an opportunity to carry out their ultimate plan of selling GNC's assets to CITIC through the bankruptcy process. (*Id.* ¶¶ 87-96). Under the "Springing Maturity Covenant" of GNC's "Tranche B-2" loan, it became due on May 16, 2020, if certain conditions were not satisfied. (*Id.* ¶¶ 88-89). Plaintiffs allege that rather than work to avoid the springing maturity, GNC Management allowed the acceleration covenant to be triggered, resulting in an obligation of approximately $109.1 million, which GNC claimed it lacked the cash to pay, despite paying $49.63 million on bankruptcy-related professional fees/expenses in the first half of 2020 and making excess payments to secured lenders in April 2020. (*Id.* ¶¶ 90-98). Plaintiffs allege that alternatives to bankruptcy were available but unexplored by GNC Management, which together with other Defendants, "conspired to file for bankruptcy" and "hand over [GNC] to the secured lenders through [the] Chapter 11 case," "in exchange for a fat reward package" for themselves, including a "retention bonus and 10% common stock in the new restructured company." (*Id.* ¶ 174).

The Complaint further alleges that, beginning in April 2020, Plaintiffs made concerted efforts to protect minority shareholder interests and prevent the bankruptcy filing. (*Id.* ¶¶ 123-134). Plaintiffs allege that they communicated repeatedly with GNC Management and Evercore, presenting alternatives for dealing with GNC's liquidity issues, but received false assurances in response. (*See id.* ¶¶ 125-134). In May 2020, GNC stated that it was exploring options "to address its capital structure – which has been exacerbated by the current pandemic" and advising those options included "filing for voluntary protection under Chapter 11." (*Id.* ¶ 135). GNC Management negotiated a short extension of the Tranche B-2 loan's springing maturity date, to June 30, 2020, but according to Plaintiffs, did so only to create the impression it was working on a solution to address its debt obligations. (*Id.* ¶¶ 135-137). The alleged scheme to facilitate CITIC's acquisition of GNC culminated with GNC's bankruptcy case, which Plaintiffs assert "would wipe out the GNC equity," "greatly benefit GNC Management and Evercore that collect significant amount of fees," and result in the secured lenders [owning] 100% of the new company's common stock." (*Id.* ¶ 139).

## C.   **The Chapter 11 Case**

On June 23, 2020, GNC filed for protection under chapter 11 of the Bankruptcy Code. (*Id.* ¶ 141). The Debtors retained Evercore as their investment banker. (Bankr. D.I. 467). According to the Complaint, Defendants' unlawful scheme continued throughout GNC's chapter 11 case and involved not only mail and wire fraud in communications with shareholders and potential investors but also misuse of the chapter 11 proceedings and fraud on the Bankruptcy Court. (*Id.* ¶ 174). For example, Plaintiffs allege that, during the auction and sale of GNC's assets, Defendants manipulated financial data to deter bidders other than CITIC/Harbin. The Complaint states:

> In order to ensure that Defendant CITIC, or Defendant GNC Management and secured lenders, who had agreed to split the new GNC 10/90, obtain the GNC, Defendant CITIC, Zhang, GNC Management, Evercore and Berube provided false financial data projecting [GNC's] disappointing [] financial performance in the future in order to deter the other potential bidders. From July 2020 to

September 2020, under the direction of Defendants CITIC, Zhang, Martindale and Tolivar, Defendants Evercore and Berube have repeatedly sent to potential bidders false financial data and access to the virtual data room (the "VDR"), which contained false GNC financial information to purposefully deter the potential bidder from participating in the public auction.

(*Id.* ¶ 156). Thus, Plaintiffs contend, the Defendants conspired and acted to induce the Bankruptcy Court, through deceit, to ultimately approve the sale as a good faith, non-collusive transaction.[3]

On October 14, 2020, the Bankruptcy Court entered an order (Bankr. D.I. 1415) ("Confirmation Order") confirming GNC's plan of reorganization (Bankr. D.I. 1415-1) ("the Plan"). The Plan permitted GNC to wind down its estate following the consummation of the asset sale to Harbin, pursuant to the Sale Order. Article IX sets forth releases, injunctions, and exculpatory provisions:

---

[3]    On September 18, 2020, the Bankruptcy Court entered an order approving the sale of substantially all of GNC's assets to Harbin (Bankr. D.I. 1202) ("the Sale Order"). As recited in the Sale Order, the Bankruptcy Court concluded that GNC had "demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale . . . prior to and outside of a plan of reorganization" and further concluded that among the sound business reasons given, GNC would use the sale proceeds to pay debts consistent with its Chapter 11 Plan of Reorganization. (Sale Order ¶ J). It found that Harbin's purchase of GNC's assets was in good faith (*id.* ¶ K), which resulted from "the highest or otherwise best offer for the Asset" which "represents a fair and reasonable offer to purchase the Assets under the circumstances of these Chapter 11 Cases." (*Id.* ¶ O). The Bankruptcy Court found that "[n]one of the Debtors, the Buyer, any other party in interest, or any of their respective representatives . . . ha[d] acted in bad faith or in any improper or collusive manner with any entity in connection therewith." (*Id.* ¶ L). Similarly, referring to the sale transaction documents, the Sale Order stated that none of the parties to those documents "are consummating the Transaction with any fraudulent or otherwise improper purpose." (*Id.* ¶ R). Noting that, prior to its entry, an opportunity for filing objections had been provided, the Sale Order denied any objection not previously withdrawn or resolved and further stated that "[t]hose parties who did not object to the Motion or the entry of this Sale Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes . . . ." (*Id.* ¶ 3). By its terms, the Sale Order is binding on, among others, "all holders of equity interests in the Debtors"— meaning GNC and its related subsidiaries as identified in the Sale Order. (*Id.* ¶ 7). Finally, the Bankruptcy Court "retain[ed] jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b) to . . . interpret, implement, and enforce" the Sale Order's terms and provisions. (*Id.* ¶ 54).

> Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code . . . the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims of any nature whatsoever, including any interest accrued on Claim from and after the Petition Date . . . against the Debtors, the Reorganized Debtors or any of their assets or properties . . . .

(Plan, Art. IX.A). The Plan further provides that certain "Exculpated Parties" as identified therein:

> shall neither have nor incur any liability to any person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the confirmation or consummation of this Plan" and various related documents.

(*Id.* Art. IX.D). The Bankruptcy Court also retained jurisdiction to "resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan, the Confirmation Order, or the Plan Administrator Agreement." (*Id.* Art. X).[4]

### D.    The DNJ Action

Plaintiffs elected not to object to a single motion or appear at a single hearing during the bankruptcy cases or to challenge any of the Bankruptcy Court's prior orders. Notwithstanding, almost a year after the Bankruptcy Court confirmed the Plan, Plaintiffs filed their initial complaint in the United States District Court for the District of New Jersey ("the DNJ Court"). *John Yong Tang v. CITIC Capital Holdings Ltd.*, No. 21-17008-JXN-AME (D.N.J.) ("the DNJ Action"), D.I. 1. Plaintiffs filed a Second Amended Complaint ("DNJ Complaint") on December 6, 2021. (DNJ D.I. 38). Plaintiffs' claims rested on the fundamental allegation that Defendants conspired to force GNC into a "sham" bankruptcy for their benefit and to the detriment of Plaintiffs. (*See, e.g. id.* ¶¶ 107,

---

[4]    After confirmation of the Plan, GNC's chapter 11 cases were closed as to various non-lead debtors but remains open for administration of the Plan as to certain liquidating debtors, including GNC (now known as "Vitamin OldCo. Holdings, Inc.").

121, 131, 151). Defendants moved to transfer the DNJ Action to the Bankruptcy Court where the Honorable Chief Judge Karen B. Owens was presiding over GNC's chapter 11 case. (DNJ D.I. 46). On October 7, 2022, the DNJ Court issued a thorough opinion concluding that a transfer pursuant to 28 U.S.C. § 1412 was "appropriate and warranted" because "the claims asserted by Plaintiffs here are inextricably intertwined with the GNC Bankruptcy Case." (DNJ D.I. 56 ("the DNJ Opinion")). The DNJ Action was thereafter transferred to this Court and referred to the Bankruptcy Court, where it was docketed as an adversary proceeding and assigned to Chief Judge Owens. Two weeks later, on November 7, 2022, Plaintiffs voluntarily dismissed that adversary proceeding.

     **E.**    **The SDNY Action**

     Three months later, on February 13, 2023, Plaintiffs filed a very similar complaint (SDNY D.I. 1) ("the SDNY Complaint") in the United States District Court for the Southern District of New York ("the SDNY Court") against the same three groups of defendants—CITIC, GNC Management, and Evercore—and a few additional defendants, asserting essentially the same claims. *John Yong Tang v. CITIC Capital Holdings Ltd.*, No. 1:23-cv-01195-AKH ("the SDNY Action"). The theories of the two complaints are the same. "To accomplish their schemes, artifices, and conspiracies each Defendant . . . scheme[d] to defraud Plaintiffs and other similarly situated minority owners by wrongfully driving GNC into bankruptcy." (*Id.* ¶ 174). The GNC bankruptcy case was a means to accomplish Defendants' unlawful objectives: "Defendants' unlawful schemes converged at the completion of the Chapter 11 bankruptcy filing on June 23, 2020." (*Id.* ¶ 176). As a result of their racketeering and other unlawful activities, Defendants injured Plaintiffs causing loss of their equity in GNC. (*Id.* ¶ 174). The Complaint asserts claims for violation of the federal RICO statute, common law fraud, conspiracy to defraud, breach of fiduciary duty, conversion, negligence, and "aiding and abetting a conspiracy." (*Id.* ¶¶ 182-226). Plaintiffs seek, among other relief, an order directing

Defendants "to divest themselves of any interest, direct or indirect, in any enterprise." (*Id*. at 58). Defendants moved to dismiss the Complaint (SDNY D.I. 48, 51, 53) ("Motions to Dismiss").

On February 7, 2024, the SDNY Court ordered that the SDNY Action be transferred to this Court pursuant to 28 U.S.C. § 1412 "[f]or the same reasons stated in the DNJ transfer order and opinion." (SDNY D.I. 83 ("the SDNY Transfer Order")).[5] The Motions to Dismiss were also transferred pursuant to the SDNY Transfer Order. (*Id.* ("Defendants also have moved to dismiss the complaint . . . These motions are to be transferred to the District of Delaware.")). Following the February 26, 2024 transfer of the SDNY Action to this Court, it was again referred to the Bankruptcy Court, docketed as an adversary proceeding, and assigned to Chief Judge Owens. (Adv. Proc. D.I. 1). On December 13, 2024, Plaintiffs filed the pending Motion.

The docket of the Adversary Proceeding reflects no hearings, discovery, or other recent activity, and no scheduling order is in place. Briefing on the Motion is complete. (D.I. 1-1, 12, 15). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    **JURISDICTION AND STANDARDS OF REVIEW**

Under 28 U.S.C. § 1334(a), federal district court judges have "original and exclusive jurisdiction of all cases under title 11." *In re IMMC Corp.*, 909 F.3d 589, 595 (3d Cir. 2018). District court judges may refer some of these matters to bankruptcy judges. *See* 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."). Section 157 "divid[es] all matters that may be referred to the bankruptcy court into

---

5    On February 20, 2024, Plaintiffs filed an appeal of the SDNY Transfer Order, which Opposing Defendants promptly moved to dismiss for lack of appellate jurisdiction. *Yong Tang et al. v. Susan M. Canning et al.,* Case No. 24-455 (2d Cir.), D.I. 34. On July 26, 2024, the Second Circuit granted Opposing Defendants' motion and dismissed Plaintiffs' appeal. *Id.*, D.I. 38.

two categories: 'core' and 'non-core' proceedings." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33 (2014) (citing 28 U.S.C. § 157). Core proceedings are matters which "invoke a substantive right provided by title 11" or "that by [their] nature could arise only in the context of a bankruptcy case." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (citation and internal quotation marks omitted). Non-core proceedings are "not . . . core" but are "otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). It is undisputed that the Adversary Proceeding is at a minimum "related to" GNC's chapter 11 case, and this Court properly referred the matter to the Bankruptcy Court pursuant to its standing order. *See* Am. Standing Order of Reference, Feb. 29, 2012 (C.J. Sleet).

With respect to Plaintiffs' request to withdraw the reference of the Adversary Proceeding, the statute provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

## III.    ANALYSIS

Defendants argue, as an initial matter, that the validity of any of the Plaintiffs' claims depends, among other things, on whether they are foreclosed by the Bankruptcy Court's prior orders and findings—"matters of bankruptcy law that the Bankruptcy Court expressly retained exclusive jurisdiction to adjudicate." (D.I. 12 at 10). As both the DNJ and SDNY Courts have held, and this Court agrees, Plaintiffs' claims, "are inextricably intertwined with the GNC Bankruptcy Case," as the Complaint "repeatedly assails the entire bankruptcy proceeding" as a sham "based on the collusive activities of Defendants, including their coordinated effort to manipulate information on which the Sale Order is based." (DNJ Opinion at 13). As the Complaint "turns on the integrity of GNC's

Chapter 11 proceedings in Delaware Bankruptcy Court," Plaintiffs' claims cannot be adjudicated without first determining whether there was any such fraud on the Bankruptcy Court and whether Plaintiffs' claims are foreclosed by the Bankruptcy Court's prior orders and findings. (DNJ Opinion at 12 ("Despite Plaintiffs' arguments to the contrary, the claims asserted in this action do require interpretation and/or enforcement of the Sale Order and Plan."); SDNY Transfer Order (transferring case for same reasons set forth in DNJ Opinion)). Such determinations should be made by the Bankruptcy Court. Additionally, Defendants argue, Plaintiffs have failed to establish entitlement to mandatory withdrawal or cause for discretionary withdrawal.

The Court agrees that Plaintiffs have failed to establish that withdrawal of the reference is mandatory, and that the claims asserted in the Complaint, supported by Plaintiffs' allegations assailing the chapter 11 proceedings, militate against discretionary withdrawal at this time.

### A.    <u>Mandatory Withdrawal</u>

On timely motion of a party, "withdrawal is deemed mandatory when (1) consideration of law outside of Title 11 ("the Bankruptcy Code") is necessary for the resolution of the case or proceeding; and (2) the consideration of federal law outside the Bankruptcy Code necessary to resolve the proceeding is substantial and material." *In re Liberty State Benefits of Del. Inc.*, 2015 WL 1137591, at *2 (D. Del. Mar. 12, 2015) (quoting *In re Cont'l Airlines*, 138 B.R. 442, 444-45 (D. Del. 1992)); 28 U.S.C § 157(d). "As the party seeking withdrawal of the reference, [Plaintiffs] bear[] the burden of demonstrating that a substantial and material consideration of nonbankruptcy law is necessary to resolve the case." *In re Cont'l Airlines*, 138 B.R. at 445.

Plaintiffs' argument for mandatory withdrawal rests entirely on the presence of its RICO claims. Plaintiffs' Motion asserts that "[t]he Proceeding is subject to mandatory withdrawal because it involves consideration of Title 11 (namely, 11 U.S.C. §§ 541, 363 and 1129 and related provisions of Chapter 11 concerning the sale of GNC's assets and confirmation of the GNC's plan of liquidation)

as well as non-bankruptcy federal law (namely, the Civil RICO statute)." (D.I. 1-1 at 15). "Because the Proceeding entails consideration of both Civil RICO and provisions of Title 11," Plaintiffs assert, "the reference must be withdrawn." (*Id*. at 15-16). As set forth in the statute, however, Plaintiffs were also required to show that "the consideration of federal law outside the Bankruptcy Code necessary to resolve the proceeding *is substantial and material.*" 28 U.S.C § 157(d). In determining whether the "substantial and material" standard has been met, this Court has emphasized that "not every adversary complaint that alleges a violation of federal non-bankruptcy law necessarily requires substantial and material consideration of that law." *In re Nortel Networks, Inc.,* 539 B.R. 704, 708 (D. Del. 2015). Indeed, "withdrawal will not be granted when only a straightforward application of a federal law is required for resolution of the pending issue." *In re Smith Corona Corp*., 205 B.R. 712, 714 (D. Del. 1996); *see also Nortel Networks*, 539 B.R. at 708 ("[W]hen only a 'simple application of well-settled law is required, withdrawal is not mandatory.'"). This distinction "furthers the policy of narrowing the scope" of withdrawal so as to "prevent the establishment of an 'escape hatch' through which most bankruptcy matters could routinely be removed to the district court." *Liberty State,* 2015 WL 1137591, at *2 (internal quotation marks and citations omitted).

The Court agrees that the presence of a federal RICO claim alone does not mandate withdrawal. *See Liberty State*, 2015 WL 1137591, at *2-3 (rejecting argument that assertion of federal RICO claim always warrants mandatory withdrawal); *In re Shad's Hanna's E., Inc.*, 2012 WL 3715709, at *1 (W.D. Pa. Aug. 28, 2012) ("[W]ithdrawal of the reference is not mandated by the presence of a RICO claim."). In *Liberty State*, this Court found mandatory withdrawal was not warranted where only a "minor portion" of the complaint "alleged violations of federal non-bankruptcy law" (*i.e.,* a RICO claim), while state law claims otherwise predominated. 2015 WL 1137591, at *2. "Even if the RICO claim was the primary allegation in the Complaint," the *Liberty State* Court found, the movant still failed to meet its burden because it made only conclusory

arguments "devoid of any analysis of how the facts of the [] RICO claim will require more than a straightforward application of the law." *Id.* at *3. Here, as in *Liberty State*, Plaintiffs' RICO claims make up only a portion of the Complaint—*i.e.,* only two out of Plaintiffs' seven claims are RICO claims (and those two are interconnected), while the remaining five are state law claims. As to whether the Complaints will require anything more than a simple application of well-settled law, Plaintiffs' Motion failed to offer any analysis to the contrary.

In their reply, Plaintiffs argue that the RICO claims are not merely ancillary to their state law claims but rather are "central to the Plaintiffs' case," and "raise numerous highly technical legal issues," including: the meaning of the word "participant" under the statute; whether providing services can be sufficient to deem one a "participant"; whether Rule 9 applies to the RICO counts; whether the Complaint satisfies "relatedness" and "continuity" standards; and whether reliance is necessary to sustain a RICO claim. (*See* D.I. 15 at 1-3). Adjudication will also require consideration of the "complex law surrounding the relationship between underlying RICO claims and RICO conspiracy claims," Plaintiffs assert. (*Id*. at 3). As these arguments were raised for the first time in Plaintiffs' reply, Defendants had no opportunity to respond. But even in reply, Plaintiffs do not argue that these issues are novel, that the law on these issues is unsettled, or otherwise explain how the facts will require more than a straightforward application of the law. Given the predominance of bankruptcy issues here, and that the two RICO claims are inseparable from the underlying allegations that the Sale Order and Plan were obtained by fraud on the Bankruptcy Court, the Court concludes that withdrawal of the reference is not mandatory.

### B.    **Permissive Withdrawal**

"The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). With respect to such permissive withdrawal, "[t]he 'cause shown' requirement in section

157(d) creates a presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court unless rebutted by a contravening policy." *Hatzel & Buehler, Inc. v. Cent. Hudson Gas & Elec. Corp.*, 106 B.R. 367, 371 (D. Del. 1989) (internal quotations omitted). To overcome that presumption, the moving party has the burden to prove that cause exists to withdraw the reference. *See In re NDEP Corp.*, 203 B.R. at 907. As noted by the Third Circuit, "cause" to withdraw the reference "will be present in only a narrow set of circumstances." *In re TZEW Holdco LLC*, 2023 WL 2663047, at *2 (D. Del. Mar. 28, 2023) (quoting *In re Pruitt*, 910 F.2d at 1171).

To determine whether cause exists for withdrawal, courts in the Third Circuit consider the five non-exclusive "*Pruitt* factors" which include: "(1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process; and (5) timing of the request for withdrawal." *Am. Classic Voyages Co.*, 337 B.R. 509, 511 (D. Del. 2006) (citing *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990)). "The above factors are not exhaustive, however; they represent certain minimum standards." *See In re NDEP Corp.*, 203 B.R. 905, 908 (D. Del. 1996). Relevant considerations also include judicial economy and whether the proceedings involve core or non-core issues. *Hatzel & Buehler inc. v. Orange & Rockland Util., Inc.*, 107 B.R. 34, 39 (D.Del.1989). The factors "are not weighed on a scale of equipoise—rather, the Defendants must overcome a scale already heavily weighted against withdrawal." *In re Elk Petroleum, Inc.*, 2022 WL 4355285, at *4 (D. Del. Sept. 20, 2022) (cleaned up). Courts also consider whether the parties have requested a jury trial, but "a demand for a jury trial [may be] insufficient cause for discretionary withdrawal if the motion is made at an early stage of the proceedings and dispositive motions may resolve the matter." *Am. Classic Voyages,* 337 B.R. at 512.

It is this Court's "general practice" not to withdraw the reference until "such time as the matter is ready for trial so that the Bankruptcy Court, which is already familiar with the parties and issues,

may oversee discovery and pre-trial matters, and narrow the issues for trial." *In re 24 Hour Fitness Worldwide, Inc.*, 2022 WL 605661, at *3 (D. Del. Jan. 4, 2022). "This practice has promoted judicial economy in this Court," and is followed unless the movant demonstrates that circumstances presented by the case provide reason to depart. *Id.; In re LTC Holdings, Inc.,* 2019 WL 4643801, at *5 (D. Del. Sept. 24, 2019) (denying motion for withdrawal in the absence of a "contravening policy to rebut the presumption that permitting the Bankruptcy Court to oversee pretrial matters . . ., and withdrawing the reference only when it is ready for a trial, will promote[] judicial economy and a timely resolution of this case"); *In re AgFeed USA, LLC*, 565 B.R. 556, 565 (D. Del. 2016) (accepting the argument that because "the Bankruptcy Court has extensive familiarity with parties, issues, and events that precipitated the Chapter 11 filing and that form the basis for these causes of action . . . it will be more economical for the parties if the Bankruptcy Court oversees the litigation" before trial, to avoid "[d]uplicating those efforts at an early stage of the cause"); *In re EXDS, Inc.*, 2006 WL 2346419 (D. Del. July 20, 2006) (same); *In re Circle of Yoakum, Tex.*, 2006 WL 2347710 (D. Del. June 23, 2006) (same). Urging the Court to deviate from its general practice, Plaintiffs argue that (1) the Adversary Proceeding asserts only non-core claims (*see* D.I. 1-1 at 16-19); (2) Plaintiffs are entitled to a jury trial (*see id*. at 19); and (3) deferring withdrawal of the reference pending the conclusion of pretrial proceedings would result in delay, duplicative proceedings and the inefficient use of judicial resources (*see id*. at 19-20).

### 1.    Whether the Claims Are Core or Non-Core

A proceeding is "core" if it "invokes a substantive right provided by title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Shubert v. L. Offs. of Paul J. Winterhalter*, 531 B.R. 546, 551 (E.D. Pa. 2015) (internal quotation marks omitted). A nonexclusive list of core proceedings is contained in 28 U.S.C. § 157(b)(2), including "matters concerning the administration of the bankruptcy estate," "confirmations of plans", and "orders

approving the sale of property." 28 U.S.C. § 157(b)(2)(A), (L), (N). Non-core proceedings are all other proceedings that are "related to a case under title 11." 28 U.S.C. § 157(c)(1). Defendants assert that "[p]roceedings that attack the integrity of the bankruptcy process, like this one, are 'core' proceedings and should be adjudicated in bankruptcy court." (D.I. 12 at 10, 13-14). Plaintiffs concede that where a party brings an action to enforce an order of the bankruptcy court, it is generally a core proceeding. (D.I. 1-1 at 18 (citing *Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minn., LLC)*), 47 F.4th 193, 200 (3d Cir. 2022) ("Because the contempt proceeding here arose out of the previously entered plan and confirmation order—which, as we have explained, themselves implicated explicitly enumerated core proceedings under § 157(b)(2)—it was also a core proceeding over which the Bankruptcy Court had jurisdiction.")). Plaintiffs contend, however, that the claims in the Complaint "do not seek to enforce or interpret any order of the Bankruptcy Court" and that "the mere fact that there are allegations that concern events in the bankruptcy does not transform Plaintiffs' causes of action arising under non-bankruptcy federal law and traditional common law into core proceedings." (D.I. 1-1 at 18). And even if Plaintiffs' claims are "arguably core from a statutory perspective,"[6] Plaintiffs assert, "there is no doubt that they are Constitutionally non-core as they are in the nature of traditional common law claims for fraud and breach of fiduciary duty and seek only monetary relief." (*Id*. at 19).

Although Plaintiffs' claims may not expressly "seek to enforce or interpret" the Bankruptcy Court's prior orders, it is difficult to see how they can be adjudicated without doing so, as the

---

[6] "Core" proceedings, enumerated non-exclusively in 28 U.S.C. § 157(b)(2), are subject to the plenary authority of the bankruptcy court. 28 U.S.C. § 157(b)(1) (a bankruptcy judge may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11."). In contrast, in "non-core" proceedings, bankruptcy courts may issue "proposed findings of fact and conclusions of law" that are subject to *de novo* review by the District Courts. 28 U.S.C. § 157(c)(1) (bankruptcy court may "hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11" but may only submit proposed findings of fact and conclusions of law to a district court judge for *de novo* review and entry of judgment).

Complaint alleges conspiracy among the Debtors' professionals and other parties released under the Plan to commit fraud in connection with obtaining the Sale Order and Plan Confirmation Order, and where the relief sought includes "[o]rdering the Defendants to divest themselves of any interest, direct or indirect, in any enterprise."  (Compl. at 58).  Where a lawsuit rests on allegations that "bear[] directly on the administration of the bankruptcy estate" and challenge the integrity of the Bankruptcy Court, it is a "core" proceeding.  *See Shubert,* 531 B.R. at 551 (claims alleging defendants breached duties as bankruptcy court-appointed professionals and aided and abetted debtor in its breach are "core" proceedings where allegations arose from post-petition conduct bearing on administration of bankruptcy estate); *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 260-61 (3d Cir. 2007) (state law malpractice claims against bankruptcy court-appointed professionals for post-petition conduct are a core proceeding concerning the administration of the estate).

Regardless, the mere presence of non-core claims is insufficient "cause" for withdrawal.  *In re LTC Holdings, Inc.,* 2019 WL 4643801, at *5 ("[p]roceedings should not be withdrawn for the sole reason that they are non-core.").  "In non-core proceedings, the bankruptcy court is given the power to submit proposed findings of fact and conclusions of law to the district court."  *AgFeed,* 565 B.R. at 564 (citing 28 U.S.C. § 157(c)(1)).  Indeed, "[p]ermitting the Bankruptcy Court to oversee pretrial matters . . ., and withdrawing it only when it is ripe for a jury trial, promotes judicial economy and a timely resolution of this case."  *Id.* at 566.

### 2. Plaintiffs' Request for a Jury Trial

"Regardless of whether the claims are core or non-core," Plaintiffs assert, the Adversary Proceeding "must be tried in the District Court because Plaintiffs have exercised their Seventh Amendment right to a jury trial."  (D.I. 1-1 at 19).  "[T]he Bankruptcy Court has not been authorized to conduct jury trials and Plaintiffs do not consent to a jury trial in the Bankruptcy Court," so "the

most the Bankruptcy Court could do here is to administer pre-trial proceedings," which Plaintiffs

assert, "will entail needless delay, duplication and waste of judicial resources." (*Id.*).

Although the assertion of a right to jury trial coupled with refusal to consent to such trial

before the bankruptcy court is not "itself sufficient cause for discretionary withdrawal," it is one of

the factors the Court considers. *See Official Comm. of Unsecured Creditors v. Fed. Indus. Prods.*,

*(In re IT Group, Inc.)*, 2007 WL 211179 at *2 (D. Del. Jan. 26, 2007). The decision of whether and

when to withdraw the reference still depends on case-sensitive factors, including whether the case is

likely to reach trial" but generally "such a right [to jury trial] does not compel withdrawing the

reference until the case is ready to proceed to trial." *Schneider v. Riddick (In re Formica Corp.),*

305 B.R. 147, 150 (S.D.N.Y. 2004). In deciding whether to withdraw the reference of a case based

on a jury demand, some courts consider (1) whether the case is likely to reach trial; (2) whether

protracted discovery with court oversight will be required; and (3) whether the bankruptcy court is

familiar with the issues presented. *In re Enron Corp.*, 317 B.R. 232, 235 (S.D.N.Y. 2004). These

factors weigh against withdrawing the reference at this early stage.

Regarding whether the case is likely to reach trial and whether protracted discovery will be

required, the case is still in its substantive infancy. There is no scheduling order in place and discovery

has yet to begin. As in *Enron*, "[t]his case is still in the early stages and because of the large number

of defendants and unresolved pre-trial matters, especially discovery, one can only speculate when it

will proceed to trial, if at all." *Enron*, 317 B.R. at 235. In particular, Defendants' Motions to

Dismiss,[7] if granted, may resolve the matter completely or narrow the claims and issues for discovery

---

[7]     Defendants' Motions to Dismiss, originally filed in the SDNY Action, were also transferred
in accordance with the SDNY Transfer Order and presumably remain pending. (SDNY
D.I. 83). The Court notes that the Motions to Dismiss were not docketed separately as part of
the transfer, however, and Defendants mention that they "intend to move to dismiss (again)."
(*See* D.I. 13 at 16). Plaintiffs argue that Defendants have been remiss in filing a Notice of
Completion of Briefing to alert the Bankruptcy Court that the Motions to Dismiss are fully
briefed and ready for decision. (D.I. 15 at 10 n.9). Regardless of whether the Motions to

or trial. *See Am. Classic Voyages Co.*, 337 B.R. at 512 (declining to withdraw reference of proceeding where, despite being "filed over two years ago, . . . [n]o discovery has taken place, and dispositive motions could resolve the matter"). Among other things, Defendants assert that the Complaint is subject to dismissal for lack of standing, as Plaintiffs' claims are derivative, not direct, claims. Defendants further assert that the Complaint is "devoid of well-pleaded facts that identify actionable conduct" and merely addresses "the elements of [Plaintiffs' claims] . . . in a conclusory manner that fails to satisfy their pleading burden under even Rule 8's notice standard, much less under the heightened Rule 9(b) standard that governs Plaintiffs' claims sounding in fraud." (D.I. 12 at 1-17). That Defendants' motions may narrow the claims or issues for trial on these separate grounds raised militates against withdrawing the reference at this time. *See, e.g., Shad's Hanna's E.*, 2012 WL 3715709, at *2 (declining to withdraw reference where "[t]he speculative nature of a jury trial on the RICO count [was] great").

Third, regarding whether the Bankruptcy Court is familiar with the issues, Plaintiffs acknowledge that the Adversary Proceeding will require consideration of provisions of prior orders "concerning the sale of GNC's assets and confirmation of the GNC's plan of liquidation." (D.I. 1 at 15). Accordingly, the Bankruptcy Court's familiarity weighs heavily against withdrawing the reference at this time, as it has clear jurisdiction and is in the best position to interpret and enforce its prior orders to the extent required by the allegations in the Complaint. On balance, the request for a jury trial does not warrant withdrawal at this early stage.

### 3.    *Pruitt* **Factors**

Finally, because this case involves a proceeding intertwined with the Bankruptcy Court's prior findings and orders, the *Pruitt* factors weigh against withdrawal. With respect to the first factor—

---

Dismiss are deemed pending or must be renewed, any substantive pre-trial determinations belong in the Bankruptcy Court and have the potential to narrow or eliminate the claims at issue.

promoting uniformity of bankruptcy administration—the Court disagrees that withdrawal of the reference will promote uniformity of administration in the Debtors' bankruptcy cases. The "Bankruptcy Court is clearly more informed about the underlying facts and issues in this case," *Liberty State*, 2015 WL 1137591, at *3, and retains jurisdiction over the orders underlying the alleged conduct, *see, e.g., Elk Petroleum,* 2022 WL 4355285, at *5. As the DNJ Court noted, Plaintiffs' claims will "require interpretation and/or enforcement of the Sale Order and Plan." (DNJ Opinion at 12). *See In re Midnight Madness Distilling, LLC*, 2024 WL 1538465, at *4 (E.D. Pa. Apr. 9, 2024) (given that "sale [was] the subject of ongoing litigation in this case . . . [a]llowing the bankruptcy court to continue handling this case up to the point of trial better promotes uniformity and judicial economy"). Moreover, the Bankruptcy Court expressly retained jurisdiction to "interpret, implement, and enforce the terms and provisions of th[e] Sale Order" and to "resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of" the Plan and its Confirmation Order, and "hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under . . . the Plan." (Sale Order ¶ 54; Plan Art. X). Accordingly, denial of the Motion will best promote uniformity.

With respect to the second factor—reducing forum shopping and confusion—withdrawing the reference should not be used as an "escape hatch" for matters properly before the Bankruptcy Court. *Liberty State,* 2015 WL 1137591, at *2-3. In evaluating this factor, the Court considers the movant's "pattern of conduct" and whether it is "yet another improper attempt to delay and forum shop." *Stream TV Networks*, 2023 WL 7928682, at *7. As Defendants point out, Plaintiffs did not raise any objections to the sale and plan in the Bankruptcy Court, opting instead to seek relief in other districts over the past three years before being transferred back to this District. Plaintiffs respond that the parties are all non-debtors, and the Motion is not an attempt to forum shop, as the "[p]roceeding will

inevitably wind up before [this] Court (either on *de novo* appeal from a legal ruling or following pretrial proceedings) no matter what happens before the Bankruptcy Court."  (D.I. 1 at 17).  According to Plaintiffs, withdrawal of the reference is appropriate now as this Court has "greater familiarity" with the common law and RICO claims in the Complaint.  (D.I. 1 at 17).  But the Bankruptcy Court is capable of handling common law and RICO claims, and in this particular case, those claims "are inextricably intertwined with the GNC Bankruptcy Case," regardless of whether the parties are non-debtors.  (DNJ Opinion at 18).  *See Shad's Hanna's E.,* 2012 WL 3715709, at *2 (declining to withdraw reference of RICO and common law claims, as bankruptcy courts "routinely handle[] these types of matters" and "withdrawing the reference would potentially promote forum shopping").

With regard to the third and fourth factors—fostering economical use of resources and expediting the bankruptcy process—it is true, as Plaintiffs assert, that the plan has been confirmed and the chapter 11 cases are winding down.  Still "economic concerns favor allowing the bankruptcy court to proceed as far as it can" where "it is much more familiar with the case and the parties."  *Midnight Madness*, 2024 WL 1538465, at *4; *400 Walnut Assocs. L.P. v.4th Walnut Assocs., L.P.*, 2015 WL 390455, at *4 (E.D. Pa. 2015) ("[T]he intimate familiarity of the Bankruptcy Court here will allow for maximum efficiency in future proceedings" and "the parties' resources will be utilized most economically by continuing in the same forum.").  Given the inextricable link between this proceeding and the Bankruptcy Court's prior orders, the proceeding would *not* be expedited by withdrawal "because the Court would first adjudicate certain claims and then potentially return issues to the Bankruptcy Court for its determination."  *Shad's Hanna's,* 2012 WL 3715709, at *2.  These concerns weigh against withdrawal.

In sum, the Court agrees that the handling of this matter by the Bankruptcy Court will "foster efficient use of judicial resources, promote uniformity in bankruptcy administration, and avoid confusion."  *In re Am. Classic Voyages*, 337 B.R. at 512.

## IV.  <u>CONCLUSION</u>

Accordingly, the Court will deny the Motion without prejudice to Plaintiffs' right to renew their request for withdrawal of the reference at such time as the proceeding is ready for trial or at such earlier time as the Bankruptcy Court may recommend.  A separate Order will be entered.